23CA2087 Peo v Hutto 07-30-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA2087
Adams County District Court No. 22CR1300
Honorable Sharon Holbrook, Judge
Honorable Stephen E. Howard, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Tiffany Hutto,

Defendant-Appellant.

---

JUDGMENT AND ORDER AFFIRMED

Division VI
Opinion by JUDGE GOMEZ
Grove and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 30, 2026

---

Philip J. Weiser, Attorney General, Josiah Beamish, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Robin Rheiner, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Tiffany Hutto, appeals the judgment of conviction and the order of restitution entered after a jury found her guilty of theft of $500 or more against an at-risk person – position of trust. She contends that (1) the evidence was insufficient to support her conviction; (2) the trial court improperly limited cross-examination of a prosecution witness; (3) the trial court admitted improper expert testimony; (4) the trial court allowed the prosecutor to commit misconduct during closing argument; and (5) the evidence was insufficient to support the amount of restitution awarded. We disagree with each contention and, therefore, we affirm the judgment and the restitution order.

## I.     Background

¶ 2     In 2012, Hutto's grandmother, Dorothy Heinz, had medical issues that caused her doctor to recommend that she have someone help her with her finances. Heinz appointed one of her daughters, Penny Carnahan, to be her financial power of attorney. A few years later, Heinz had a stroke, and Carnahan became even more involved in her finances.

¶ 3     In 2018, Heinz and Carnahan ceased contact due to a family dispute. Heinz closed the bank account she shared with Carnahan,

1

and she opened a joint bank account with another of her daughters, Hutto's mother, Marlena Dubee.

¶ 4        In 2019, Dubee was diagnosed with severe Alzheimer's disease and moved in with Heinz, who by then had dementia.  In May 2021, Hutto also moved into the home with her husband and two children to care for Dubee and Heinz.  A month later, Dubee was moved to a long-term care facility, where she remained until her death in 2022.

¶ 5        Throughout this time, Heinz's dementia got progressively worse.  For example, on a questionnaire used to diagnose dementia, called the SLUMS (Saint Louis University Mental Status) test, Heinz's score declined over time: She had a SLUMS score of 9 (out of 30) in 2019, a score of 4 in May 2020, and a score of 2 in August 2021.[1]  Heinz's doctor recalled that during the May 2020 test, Heinz, who was then ninety-four years old, was unable to answer most of the questions and thought she was living with her parents on a farm.  The doctor testified that Heinz did not then appear to be aware of her surroundings or able to make decisions for herself.

---

[1] A doctor who had treated Heinz for dementia testified that a score of 26 to 30 reflects normal cognition, 20 to 26 signifies mild cognitive impairment, and 0 to 20 indicates dementia.  She also explained that a single-digit score indicates severe dementia.

Later in 2020, Hutto reported to Heinz's doctor that Heinz was becoming more aggressive and paranoid and wasn't eating or drinking normally.

¶ 6    In July 2021, Heinz fell while at home, and her injuries required her to be hospitalized. While Heinz was in the hospital, Carnahan and the siblings' brother filed a petition for an emergency guardianship and conservatorship over her, which a court granted. After being released from the hospital, Heinz was moved into a memory care facility, where she died a month later.

¶ 7    After becoming Heinz's conservator, Carnahan began looking through Heinz's finances and noticed "there [were] a lot of expenditures that just didn't click." As Carnahan later explained, she discovered that

> [t]here were . . . multiple DoorDashes in one day. Large amounts of pet store — dog food, . . . pet supplies. Car wash, . . . gas stations. My mom did not have a car. There was a towing charge for the same time period that [Hutto] had moved into my mom's and had disabled vehicles towed into her yard. There [were] cell phones. There was car insurance. Utility payments for Northglenn [where Hutto had been living with her brother before moving in with Heinz]. There was no reason for my mom to pay Northglenn. Amazon fees, Amazon.com, CBD.com.

Carnahan discovered that these kinds of purchases had continued to occur even while Heinz was hospitalized.

¶ 8 Following a police investigation, Hutto was charged with theft of $500 or more from an at-risk person while acting in a position of trust. After a trial, the jury found her guilty as charged. The trial court ordered her to pay restitution for the benefit of Heinz's estate. This appeal followed.

## II. Sufficiency of the Evidence

¶ 9 Hutto first contends that the prosecution failed to present sufficient evidence to support her conviction for theft. We disagree.

### A. Relevant Legal Standards

¶ 10 We review challenges to the sufficiency of the evidence de novo, determining whether the evidence presented was sufficient in both quantity and quality to support the defendant's conviction. *McCoy v. People*, 2019 CO 44, ¶ 63. In doing so, we assess whether the evidence, viewed in the light most favorable to the prosecution, supports a reasonable conclusion that the defendant is guilty beyond a reasonable doubt. *People v. Wright*, 2021 COA 106, ¶ 29.

¶ 11 However, "we 'may not serve as a thirteenth juror' by considering whether we 'might have reached a different conclusion

4

than the jury.'" *Thomas v. People*, 2021 CO 84, ¶ 10 (quoting *People v. Harrison*, 2020 CO 57, ¶ 33). Thus, we will disturb the verdict only if, despite drawing every reasonable inference in favor of the prosecution, the record is unsubstantial and insufficient to support a guilty verdict beyond a reasonable doubt. *Clark v. People*, 232 P.3d 1287, 1291-92 (Colo. 2010).

¶ 12    A person commits theft when they "knowingly obtain[], retain[], or exercise[] control over anything of value of another without authorization" and with "inten[t] to deprive the other person permanently of the use or benefit of the thing of value." § 18-4-401(1)(a), C.R.S. 2025. Theft is a class 3 felony offense when the thing of value is $500 or more, the victim is an at-risk person, and the offender is acting in a position of trust. § 18-6.5-103(5), C.R.S. 2025. A person is at considered "at-risk" when they are seventy years old or older. § 18-6.5-102(3), (4.5), C.R.S. 2025. A person is in a "[p]osition of trust" when they "assum[e] a responsibility, duty, or fiduciary relationship toward an at-risk adult." § 18-6.5-102(12).

¶ 13    A person acts "knowingly" when they are "aware that [their] conduct is of such nature or that such circumstance exists." § 18-

1-501(6), C.R.S. 2025.  Such knowledge can be inferred from circumstantial evidence.  *See People v. Donald*, 2020 CO 24, ¶ 37.

### B.    Application

¶ 14    Hutto disputes the sufficiency of the evidence to establish that she made the purchases in question and that, in doing so, she acted knowingly, without authorization, and with an intent to deprive Heinz of her money.

¶ 15    In particular, Hutto points to the lack of direct evidence as to who used Heinz's debit card for the purchases, whose name was on that card, whether Hutto knew she lacked authorization from Heinz or Dubee to make the purchases (since the debit card was linked to Heinz and Dubee's joint account), whether any of the charges may have been accidental, exactly what items were purchased, and whether Heinz may have consumed or otherwise benefited from some of those items.  However, regardless of the lack of direct evidence on those specific points, the jury could infer that Hutto made the purchases without authorization and with the requisite knowledge and intent from the following circumstantial evidence:

- Heinz had severe dementia back in 2019 that got progressively worse over time.

- Heinz's doctor testified that she and Hutto discussed Heinz's dementia and its progressive severity. She also testified that as the dementia progressed, Hutto complained of difficulties taking care of Heinz and reported that Heinz wasn't eating or drinking normally.

- Carnahan — not Hutto — held Heinz's financial power of attorney.

- Carnahan testified that before living with Hutto, Heinz was "very frugal," never ordered food delivery, and didn't eat out very often. The siblings' brother likewise testified that Heinz was "very frugal" and was always worried about running out of money.

- Dubee, who suffered from severe Alzheimer's, moved out of the family residence and into a long-term care facility in June 2021.

- Transaction records showed that between July 2020 and August 2021, over two hundred food purchases were made with Heinz's debit card, either at fast food restaurants or from Hutto's DoorDash account, totaling more than $7,000.

- The records showed that many of the charges were made past 8 p.m., yet Hutto's husband acknowledged that Heinz usually went to bed at 8 p.m.

- Carnahan testified that when Heinz became hospitalized in July 2021, she was "very malnutritioned" and only weighed about a hundred pounds.

- The records showed that during the time Heinz was in the hospital, her debit card was used to pay over $800 for DoorDash food delivery, fast food, car expenses, and merchandise that didn't appear to be for Heinz's benefit.

- The attorney who represented Carnahan and her brother in seeking the guardianship and conservatorship testified that, in civil proceedings relating to the disposition of Heinz's estate, Hutto admitted that she — not Heinz — had made the purchases during Heinz's hospitalization. For instance, the attorney reported that Hutto admitted that while Heinz was in the hospital, she used Heinz's debit card to make purchases at Walmart and to pay for expenses for her own car. The attorney also testified that Hutto admitted to making the DoorDash purchases while

Heinz was in the hospital (though she suggested some of them may have been accidental) and that she didn't say Heinz had given her permission for the purchases. And the attorney testified that Hutto admitted she had the only existing debit card for Heinz's account.

¶ 16  Viewing all this evidence in the light most favorable to the prosecution, the evidence was sufficient in both quantity and quality to support Hutto's conviction for theft. Specifically, the evidence is sufficient to support findings beyond a reasonable doubt that Hutto made the challenged purchases; that she knew she didn't have authorization from Heinz (or Dubee) for the purchases; that she knew even if Heinz was aware of the purchases, Heinz wasn't able to consent to them due to her severe dementia; and that the purchases were made to benefit Hutto, not Heinz. *See Mata-Medina v. People*, 71 P.3d 973, 978 (Colo. 2003) (a defendant's subjective awareness may be inferred from their conduct and the surrounding circumstances).

### III.  Limitation on Cross-Examination

¶ 17  Hutto next contends that the trial court improperly limited defense counsel's cross-examination of Carnahan about her

financial interest in Hutto's conviction, given that she stood to receive a portion of any restitution paid to Heinz's estate. We discern no reversible error.

### A. Relevant Legal Standards

¶ 18 A trial court has wide latitude to place reasonable limits on the nature and scope of cross-examination. *Merritt v. People*, 842 P.2d 162, 166 (Colo. 1992); *People v. Margerum*, 2019 CO 100, ¶ 9. We generally review a court's limits on cross-examination, like other evidentiary rulings, for an abuse of discretion. *People v. Morse*, 2023 COA 27, ¶ 42. A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair or is based on a misapplication of the law. *People v. Carter*, 2015 COA 24M-2, ¶ 27.

¶ 19 But the Confrontation Clauses of the United States and Colorado Constitutions guarantee a criminal defendant's right to cross-examine prosecution witnesses. *See* U.S. Const. amend. VI; Colo. Const. art. II, § 16; *Carter*, ¶ 30. Thus, a court may not place such excessive limits on cross-examination that it deprives the defendant of a meaningful opportunity to present a complete defense. *Carter*, ¶¶ 30-32; *People v. Conyac*, 2014 COA 8M, ¶ 92.

We review de novo whether limits on cross-examination violated a defendant's Confrontation Clause rights. *Carter*, ¶ 28.

¶ 20 We review preserved evidentiary errors for harmlessness, such that we will reverse only if an error, in light of the entire trial record, substantially influenced the verdict or impaired the trial's fairness. *People v. Davis*, 312 P.3d 193, 195 (Colo. App. 2010), *aff'd on other grounds*, 2013 CO 57. But we review errors in violation of a defendant's Confrontation Clause rights under the constitutional harmless error standard, such that we will reverse unless the error is harmless beyond a reasonable doubt. *Carter*, ¶ 28; *Conyac*, ¶ 92. In determining whether a Confrontation Clause violation is harmless beyond a reasonable doubt, we consider the importance of the testimony to the prosecution's case, the cumulative nature of the testimony, the presence or absence of evidence corroborating or contradicting the testimony, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case. *People v. Phillips*, 2012 COA 176, ¶ 93.

## B. Application

¶ 21 We conclude that any error in limiting the defense's cross-examination of Carnahan was harmless.

¶ 22    As relevant here, Carnahan testified for the prosecution about Heinz's spending habits and frugal lifestyle during the time Carnahan was actively assisting with Heinz's finances — that is, before the time period at issue in this case.

¶ 23    On cross-examination, defense counsel asked Carnahan if the prosecutor had talked with her about restitution. She answered, "Yes." Defense counsel then asked if Hutto would have to pay a particular amount of restitution if she was convicted. The prosecutor objected on relevance grounds, and the court sustained the objection, reasoning that restitution is "a statutory right, it's not impeachment." The court and counsel discussed the issue later, outside the presence of the jury, when defense counsel asked to recall Carnahan for further cross-examination on the issue of restitution. The court then reaffirmed its decision that entitlement to restitution "does not pose the same level of bias because it is a statutory right."

¶ 24    It is true, as Hutto points out, that a witness's partiality is always relevant. *See Margerum,* ¶ 10. It is also true that as a beneficiary of Heinz's will, Carnahan stood to receive a portion of whatever restitution the court might award upon Hutto's conviction.

Thus, Carnahan was in a position to financially benefit from Hutto's conviction, which could've been a basis for cross-examining her about her potential bias. *See Margerum v. People*, 2019 CO 100, ¶ 11 ("[A] court must allow broad cross-examination of a prosecution witness as to bias, prejudice and motivation for testifying." (quoting *People v. Bowman*, 669 P.2d 1369, 1375 (Colo. 1983))); *Tollifson v. People*, 112 P. 794, 797 (Colo. 1910) (Courts should afford "[g]reat latitude" in the cross-examination of a witness's "connection with the subject-matter being tried," including "any evidence tending to show the witness is interested in procuring a conviction."); *see also People v. Hughes*, 367 N.E.2d 485, 486-87 (Ill. App. Ct. 1977) (the trial court erred by precluding cross-examination on a prosecution witness's interest in obtaining a conviction in the hopes of receiving restitution).

¶ 25    Nonetheless, even assuming the trial court erred by limiting defense counsel's cross-examination of Carnahan, that error doesn't warrant reversal under either reversal standard. More specifically, even if any error breached Hutto's Confrontation Clause rights, it was harmless beyond a reasonable doubt.

¶ 26    Carnahan's testimony wasn't critical to the prosecution's case. Hutto argues that the prosecution relied on Carnahan's testimony to show that the DoorDash and other fast food purchases were "out of character and more than [Heinz] would make, let alone eat." But Carnahan's testimony wasn't needed to show that. Her brother also testified about Heinz's spending habits, noting that she was "very frugal" and "watch[ed] just about every cent she spent."

¶ 27    More critically, though, evidence of Heinz's spending habits wasn't necessary to support the verdict. To prove the theft charge, the prosecution needed to show only that Hutto knowingly obtained or exercised control over at least $500 from Heinz without authorization and with an intent to permanently deprive Heinz of it. *See* §§ 8-4-401(1)(a), 18-6.5-103(5). The evidence established that, just during the time Heinz was hospitalized, Hutto spent more than that amount — over $800 — on DoorDash food delivery, fast food, car expenses for Hutto's car, and other items that didn't appear to be for Heinz's benefit. And based on Heinz's age, her poor health, and Hutto's own statements to Heinz's doctor about Heinz not eating or drinking normally, the jury could readily conclude that Heinz didn't herself need to spend over $7,000 in DoorDash and

14

other fast food charges in a year's time — particularly when several of those charges were made after her usual bedtime. The jury could also readily conclude that, given Heinz's severe dementia, as shown by her very low SLUMS scores in 2020 and 2021 and her doctor's testimony about her lack of awareness of her surroundings and her inability to make decisions for herself, Heinz lacked the capacity to authorize the purchases Hutto made over the course of that year.

¶ 28  Thus, the prosecution's case was very strong, and it didn't need to rely much on the testimony from Carnahan. Nonetheless, the court allowed extensive cross-examination of Carnahan, including as to her potential bias in light of the intrafamily dispute.

¶ 29  For all these reasons, we are confident that any error in limiting defense counsel's cross-examination of Carnahan was harmless beyond a reasonable doubt. *See Phillips*, ¶ 93.

## IV.   Expert Testimony

¶ 30  Hutto also contends that the trial court abused its discretion by admitting expert testimony on principles of civil probate law and allowing the expert to usurp the role of the jury. We disagree.

## A.     Relevant Legal Standards

¶ 31     Again, we review a trial court's evidentiary rulings for an abuse of discretion.  *See Morse*, ¶ 42.

¶ 32     A trial court may admit expert testimony if, among other things, the expert is qualified to offer the testimony and the testimony will be helpful to the jury.  CRE 702; *People v. Cooper*, 2021 CO 69, ¶ 47.  Expert testimony is helpful if it will assist the fact finder either in understanding other evidence or in determining a fact at issue.  *Cooper*, ¶ 48.  Expert testimony also must satisfy CRE 403, *People v. Rector*, 248 P.3d 1196, 1200 (Colo. 2011), which provides that, even if relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

¶ 33     While an expert may provide testimony that "embraces an ultimate issue . . . of fact," CRE 704, an expert "may not usurp the function of the jury" by telling the jury what verdict to reach, *People v. McMinn*, 2013 COA 94, ¶ 51.  To determine whether an expert usurped the jury's function, we consider factors such as (1) whether the expert's testimony was clarified on cross-examination; (2) whether the expert expressed an opinion of the applicable law or

16

legal standards; (3) whether the court properly instructed the jury on the law and the fact that it may accept or reject the expert's opinion; and (4) whether the expert opined that the defendant committed the crime. *Rector*, 248 P.3d at 1203.

## B.  Application

¶ 34    Hutto's challenge concerns the trial testimony of the attorney who represented Carnahan and her brother in the guardianship and conservatorship proceeding.  Before trial, the prosecution endorsed the attorney as an expert witness in elder law and as a factual witness based on his role in the guardianship and conservatorship proceeding and in a civil probate proceeding determining which of Heinz's wills was valid.

¶ 35    Hutto moved to preclude the attorney's proposed expert testimony on the grounds that it would be irrelevant and unduly prejudicial and would present conclusions on ultimate issues in the case.  The trial court denied Hutto's motion and qualified the attorney as an expert witness.[2]

---

[2] We reject the People's argument that Hutto failed to preserve this issue.  Through her pretrial objections, which her counsel reasserted at trial, she sufficiently preserved the issue.

¶ 36    At trial, the attorney testified as a generalized expert about the principles of legal capacity to make a will or a gift, powers of attorney, guardianships, and conservatorships. He then transitioned into testifying as a lay witness about his role in the guardianship and conservatorship proceeding and in the will contest that followed Heinz's death.

¶ 37    Hutto first challenges the attorney's expert testimony — particularly the testimony relating to legal capacity — on the basis that it was unhelpful, confusing, and unfairly prejudicial. We conclude that the trial court didn't abuse its discretion by determining that the testimony was helpful and that its probative value was not substantially outweighed by the potential for undue prejudice or confusing the jury.

¶ 38    The attorney's explanation of relevant legal concepts, including legal capacity and its effect on a person's ability to consent to financial decisions, was helpful to the jury and not unduly confusing or prejudicial. Heinz's ability to consent to Hutto's purchases was relevant to the elements of theft — in particular, to whether Heinz authorized Hutto to make the purchases and whether Hutto knew that Heinz either didn't or couldn't consent to

the purchases. The attorney also explained that capacity to make a will is somewhat different than capacity to make a gift and that different standards of proof apply in civil and criminal cases, thus minimizing any confusion to the jury about how the criminal case related to the earlier civil proceedings.[3] And the prosecutor made clear when he transitioned from posing questions to the attorney as an expert witness and posing questions to him as a lay witness, thus reducing the likelihood that the jury might be confused about the attorney's dual role.[4]

¶ 39 Hutto also asserts that the attorney's trial testimony usurped the jury's role. She specifically challenges the following statements:

- The attorney said that a magistrate found that Heinz lacked testamentary capacity to make an updated will in May 2020.

---

[3] To the extent that Hutto argues the attorney's testimony implicitly lowered the burden of proof, we disagree. The attorney explained that the standards governing the two civil proceedings were different from those governing this criminal case.

[4] The court also instructed the jury that the attorney's "testimony about his personal knowledge about [Hutto] and the allegations in this case [we]re not considered expert testimony."

- The attorney said that after the court granted the petition for guardianship and conservatorship of Heinz, "Hutto would have no authority whatsoever to do anything with . . . Heinz's money."

¶ 40   Applying the *Rector* factors, *see id.*, we conclude that the statements didn't usurp the role of the jury. First, the attorney clarified on cross-examination that (1) the magistrate's capacity finding required a lower burden of proof and a somewhat different legal standard than that required in these criminal proceedings, and (2) the attorney hadn't advised Hutto as to how the court's approval of the guardianship and conservatorship petition impacted her authority regarding Heinz. Second, the attorney didn't express any opinion on the law or legal standards relevant to the theft claim; in fact, he expressly stated that he "d[id]n't even know what the elements of criminal theft [we]re." Third, the court properly instructed the jury on the law and the fact that it was free to accept or reject any of the witnesses' testimony. And fourth, the attorney didn't opine that Hutto had committed theft.

¶ 41   Accordingly, we reject Hutto's challenges to the trial court's admission of the attorney's testimony.

20

## V. Prosecutorial Misconduct

¶ 42    Hutto also contends that the trial court erred by allowing the prosecutor to commit misconduct during closing argument.  She specifically asserts that the prosecutor improperly commented on her decision not to testify at trial and shifted the burden to the defense to prove her innocence.  Again, we disagree.

### A. Relevant Legal Standards

¶ 43    In reviewing a claim of prosecutorial misconduct, "we consider whether the prosecutor's conduct was improper and whether any impropriety requires reversal." *People v. Walker*, 2022 COA 15, ¶ 27.  "Whether a prosecutor's statements constitute misconduct is generally a matter left to the trial court's discretion." *Domingo-Gomez v. People*, 125 P.3d 1043, 1049 (Colo. 2005).  However, if the prosecutor's statements implicate a defendant's constitutional right to remain silent, the court's decision to allow the statements is subject to de novo review. *People v. Thames*, 2019 COA 124, ¶ 25.

¶ 44    When, as here, the defendant didn't object to the alleged misconduct, we reverse only if any error is plain. *Wend v. People*, 235 P.3d 1089, 1097 (Colo. 2010).  For prosecutorial misconduct to constitute plain error, it must be obvious, *People v. Fortson*, 2018

COA 46M, ¶ 77, and must "so undermine[] the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the jury's verdict," *Domingo-Gomez*, 125 P.3d at 1053.

¶ 45    A prosecutor has wide latitude in closing argument and may refer to the strength and significance of the evidence, conflicting evidence, and reasonable inferences that may be drawn from the evidence. *People v. Rhea*, 2014 COA 60, ¶ 46. However, the prosecutor must stay within appropriate limits. *Id.* at ¶ 47; *see also Domingo-Gomez*, 125 P.3d at 1048 ("While a prosecutor can use every legitimate means to bring about a just conviction," they have "a duty to avoid using improper methods designed to obtain an unjust result.").

¶ 46    One such limit is that a prosecutor may not comment on a defendant's decision not to testify. *Howard-Walker v. People*, 2019 CO 69, ¶ 38; *see also Martinez v. People*, 425 P.2d 299, 302 (Colo. 1967) (outlining what constitutes an impermissible reference to a defendant's exercise of their right to remain silent at trial).

¶ 47    A prosecutor also may not shift the burden of proving innocence to the defense. *People v. Duncan*, 2023 COA 122, ¶ 32. To assess whether a prosecutor did so, we consider whether (1) the

prosecutor specifically argued or tried to establish that the defense carried the burden of proof; (2) the prosecutor's actions were a fair response to the defense's questioning and comments; and (3) the court and counsel informed the jury about the presumption of innocence and the prosecution's burden of proof. *Id.*

## B. Application

¶ 48 Hutto challenges the following statements from the prosecutor during closing argument:

- "[Hutto], herself, when questioned about purchases, she admits to taking to [Carnahan and her brother's attorney]. Does not say, oh, yeah, I made those purchases because my grandmother said I can spend her money for myself, instead she denies. Denies knowledge of what the purchases were about."

- "What about [Hutto's] consciousness of guilt? What in this case, what facts in this case, show you that [she] knew that she was committing theft, that she was intending to permanently deprive her grandmother of her money? First, she again doesn't claim that she ever had

23

permission to use this account for her own purposes or her family's purposes."

- "She[,] when confronted by [the attorney,] says, oh, these purchases to [DoorDash] were accidental or I don't know about these purchases. If you felt like you had permission to conduct those transactions, you would say it. If you had been told you could conduct those transactions, you would say it. That's not what she does. She shows you she knows it was wrong to do that."

- "There is no evidence before you in this case that suggests that [Heinz] gave permission for [Hutto] to use her bank account for anything other than her own means. There is actually not even evidence that she gave permission to have her use [it] for her own needs."

¶ 49    We perceive no error — let alone plain error — by the trial court in allowing the prosecutor to make these statements.

¶ 50    The statements do not appear to be in any way directed at Hutto's decision not to testify at trial. Rather, they referred to Hutto's testimony from a prior civil proceeding and, specifically, the things she said — and didn't say — in that proceeding. As previous

divisions of this court have explained, "A defendant cannot have it both ways. If [they] talk[], what [they] say[] or omit[] is to be judged on its merits or demerits." *People v. Knapp*, 2020 COA 107, ¶ 51 (quoting *Davis*, 312 P.3d at 198); *see also People v. Gallegos*, 2023 COA 47, ¶ 92 (the prosecutor's statements didn't infringe on the defendant's right to remain silent when they didn't refer to or appear calculated to direct the jury's attention to the defendant's decision not to testify), *aff'd on other grounds*, 2025 CO 41M.

¶ 51 Nor did the statements shift the burden of proof to the defense. The prosecutor never argued or tried to establish that Hutto had the burden of proof; the prosecutor's arguments were a fair response to the evidence and arguments presented at trial; the court correctly informed the jury about Hutto's presumption of innocence and the prosecution's burden of proof; and both counsel, in their closing arguments, reiterated that the prosecution bore the burden of proof beyond a reasonable doubt. *See Duncan,* ¶ 32.

## VI. Restitution

¶ 52 Lastly, Hutto contends that there was insufficient evidence to support the amount of restitution ordered. We aren't persuaded.

## A. Relevant Legal Standards

¶ 53 In seeking restitution, the prosecution must prove by a preponderance of the evidence that the defendant's conduct proximately caused the victim's loss and the amount of that loss. *People v. Babcock*, 2023 COA 49, ¶ 19, *aff'd*, 2025 CO 26.

¶ 54 Whether there was sufficient evidence to support a restitution award is a matter we review de novo. *People v. Stone*, 2020 COA 24, ¶ 7. In undertaking such review, we ask "whether the evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, establishes by a preponderance of the evidence that the defendant caused that amount of loss." *Id.* (quoting *People v. Barbre*, 2018 COA 123, ¶ 25). We draw every reasonable inference in favor of the trial court's decision, and we cannot disturb the trial court's findings if the record supports them, even if reasonable people might arrive at different conclusions based on the same facts. *People in Interest of S.G.L.*, 214 P.3d 580, 583 (Colo. App. 2009).

## B. Application

¶ 55    The trial court ordered Hutto to pay $7,703.79 in restitution to Heinz's estate.[5]  For largely the same reasons we concluded that the trial evidence was sufficient to support Hutto's conviction, we likewise conclude that the evidence presented at trial and at the restitution hearing supports the restitution award.  As before, we conclude that there is sufficient evidence to support findings that Hutto made the challenged purchases; that she knew she didn't have authorization from Heinz (or Dubee) for the purchases; that she knew even if Heinz was aware of the purchases, Heinz wasn't able to consent to them due to her severe dementia; and that the purchases were made to benefit Hutto and her family, and not to benefit Heinz.  Although Hutto argues that some of the purchased items may have been legitimate, the record supports the trial court's contrary finding, and so we may not disturb it.  *See id.*

---

[5] As Hutto notes, the trial court initially indicated that it was awarding $7,019.54 in restitution but later apparently corrected the amount to $7,703.79, which was the full amount sought by the prosecution.  We therefore consider Hutto's sufficiency challenge as it relates to the full $7,703.79 awarded.

¶ 56 Accordingly, we reject Hutto's challenge to the restitution award.

## VII. Disposition

¶ 57 The judgment and restitution order are affirmed.

JUDGE GROVE and JUDGE MOULTRIE concur.